UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| FERMÍN RAMOS SOBERANO, | CASE NO. C21-1084 RSM |
| Petitioner, | ORDER IMPOSING SANCTIONS |
| v. | |
| ANDREA ARREYGUE GUILLEN, | |
| Respondent. | |

## I. INTRODUCTION

This matter is before the Court to address concerns related to the conduct of Petitioner's counsel, Ms. F. Andrekita Silva, in this case. The case itself dealt with a Petition, under the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"),[1] for the return of a father's children to Mexico after the mother unilaterally moved the children to the United States. At numerous points throughout this case, the Court was concerned by Ms. Silva's actions. On several occasions, the Court shared, or attempted to share, its concerns with Ms. Silva. But the Court's efforts were generally met with indignation and argument.

---

[1] Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11670, 1343 U.N.T.S. 89 (*effective* July 1, 1988).

ORDER – 1

The Court was spurred to action at the conclusion of this case, when it learned that Ms. Silva had repeatedly sought a final order returning the children to Petitioner's custody in Mexico after Petitioner had agreed, in the parties' Mexican divorce proceedings, that the children could remain in the United States with Respondent. Apart from seeking a final order possibly inconsistent with the parties' agreement, Ms. Silva failed to bring the dispositive agreement to the Court's attention.

When the Court learned of the parties' settlement agreement, from Respondent's pro bono counsel, the Court promptly set a hearing to resolve this matter consistent with the parties' agreement, to better understand the sequence of relevant events, and to attempt, once again, to raise its concerns with Ms. Silva. At the hearing, the Court determined that the parties' agreement resolved the central question of this case: Whether the children should be returned to Mexico or remain in the United States. As a result, the Court determined that the active preliminary injunction should be dissolved, that the action should be dismissed, and Respondent's pro bono counsel was forced to incur unnecessary expenses because of Ms. Silva's failure to notify the Court of the parties' agreement. Notifying Ms. Silva that it may impose sanctions, and hoping for a fuller, franker, and more satisfactory explanation, the Court requested that Ms. Silva provide a letter to chambers[2] "regarding the concerns expressed by the Court and [the] potential actions to be taken." Dkt. #86.

Having considered Ms. Silva's response and the remainder of the record, the Court sanctions Ms. Silva for the unnecessary costs incurred by Respondent's pro bono counsel. The Court also will provide a copy of this Order to the United States Department of State, the United

---

[2] Ms. Silva has since filed that letter on the docket. *See* Dkt. #92 at 5–11.

ORDER – 2

States' Central Authority under the Convention,[3] which facilitates and monitors this type of action. Finally, the Court will file a grievance, based on this Order, with the Washington State Bar Association ("WSBA") so that it may consider whether disciplinary action is warranted.

## II. BACKGROUND

### A. The Dispute Giving Rise to this Case[4]

Petitioner and Respondent were married and lived together in Morelia, Michoacán, Mexico, where they had three minor children. In 2018, Respondent filed for divorce in a Mexican family court. Initially, Respondent enjoyed sole custody of the children because Petitioner was ordered to vacate the family's residence. After some time, the parties agreed to share custody, alternating weekly, and the Mexican court entered an order to that effect.

On August 2, 2020, Respondent did not deliver the children to Petitioner, as required by the custody order, and instead took the children to Lynnwood, Washington, where they continue to live. Petitioner did not immediately know where Respondent had taken the children, but he suspected that it may be Lynnwood because the family had previously traveled to Lynnwood to visit Respondent's father and brothers. Through limited contacts with one of the children, Petitioner confirmed that they were living in Lynnwood, in the same apartment as some of Respondent's family, and obtained an address.

Petitioner first sought to regain custody of his children within the Mexican divorce proceedings—where Respondent continued to be represented by Mexican counsel—and by filing

---

[3] Each nation signing on to the Convention is to "designate a Central Authority to discharge the duties which are imposed by the Convention upon such authorities." Convention, art. 6.

[4] The Court does not find it necessary to provide citations to the record in support of the factual background as it is included here only to provide a frame of reference for Ms. Silva's actions. The factual background is supported by the verified petition filed in this action and documents Petitioner filed in support of his motion for a temporary restraining order. *See generally*, Dkts. #1 and #12.

ORDER – 3

a criminal complaint for child abduction with the Mexican authorities. When these efforts were unsuccessful, Petitioner prepared a Petition for return of the children under the Convention and filed it, on or around June 24, 2021, with Mexico's Central Authority, the Secretaría de Relaciones Exteriores. Because the children were believed to be in the United States, Mexico's Central Authority put Petitioner in contact with its U.S. counterpart, the Department of State. The Department of State then helped to connect Petitioner and Ms. Silva, whom it had identified as a local attorney that handled child custody matters, and Ms. Silva filed a Petition for the return of the children with this Court on August 13, 2021. Dkt. #1.

**B. Proceedings Before the Court**

After this action was filed, it did not proceed to resolution, for a variety of reasons, within six weeks, an aspirational and non-obligatory timeframe for the resolution of cases under the Convention.[5] First, and not directly bearing on the six-week timeframe, Petitioner delayed more than a year[6] from the children's departure to seek their return, a fact that significantly impacted

---

[5] The Convention provides only that cases are to proceed "expeditiously." Convention, art. 2 (contracting states are to "use the most expeditious procedures available" to satisfy the Convention's objectives). Additionally, the Convention provides that if a decision has not been rendered within six weeks of filing "the applicant or the Central Authority of the requested State" may "request a statement of the reasons for the delay." Convention, art. 11. These provisions, along with the explanatory report guiding the Convention's application, set forth an "aspirational 'non-obligatory time-limit of six weeks' for courts to reach a decision after commencement of proceedings." *Holder v. Holder*, 392 F.3d 1009, 1023 (9th Cir. 2004) (quoting Elisa Pérez–Vera, Explanatory Report ¶ 11, in 3 Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction 426 (1982); *see also Monasky v. Taglieri*, ___ U.S. ___, 140 S.Ct. 719, 724 (2020) (noting six-week timeframe, "[t]o avoid delaying []custody proceedings" in children's country of habitual residence). Here, Petitioner did not establish that the Mexican divorce proceedings, where Respondent continued to be represented by counsel, were substantially delayed by the absence of Respondent or the children.

[6] Somewhat reasonably, Ms. Silva excused Petitioner's delay as related to the complications of the global COVID-19 pandemic. Ms. Silva, however, did not extend the same grace to the Court, repeatedly asserting that the Court mishandled this action because of delays also attributable, in part, to the complications of the global COVID-19 pandemic.

ORDER – 4

these proceedings.[7] Then, the action was further delayed after filing by Petitioner's struggles to properly effect service, despite possessing accurate contact information for Respondent. Petitioner's ex-parte request for a temporary restraining order, primarily to limit Respondent's ability to remove the children from the Court's jurisdiction, was likewise delayed by Petitioner's failure to effect service or provide Respondent adequate notice.  When additional attempts at service were unsuccessful, beyond providing Respondent some notice of the proceedings, the Court entered a temporary restraining order limiting Respondent's ability to remove the children from the Court's jurisdiction.  Dkt. #25.  When Respondent still did not appear, the Court converted the temporary restraining order to a preliminary injunction and ordered the United States Marshals to attempt service to prompt Respondent's participation.  Dkt. #30.  Finally, Respondent was successfully served on November 3, 2021.  Dkt. #31.

After Respondent was properly served, the case proceeded more rapidly.  Respondent appeared, pro se, at the next scheduled hearing, but the Court concluded that Respondent's limited English proficiency would significantly delay proceedings and would interfere with Respondent's ability to represent her interests and convey her opinions as to the children's best interests. Dkts. #34 and #35.  To serve the interests of justice, the Court sought pro bono counsel for Respondent, resulting in some additional delay before the Court could finally hold a final evidentiary hearing on January 21, 2022.

At the final hearing, the Court arranged interpreters for both parties and, with the assistance of counsel, both parties were able to fully inform the Court of the issues they believed

---

[7] The Convention provides that if more than one year passes between the wrongful removal or retention of the children and the commencement of judicial proceedings, the judicial officer may consider whether "the child is now settled in its new environment" and exercise discretion in deciding whether to order the children's return to their country of habitual residence. Convention, art. 12.  If the action is commenced inside of one year, the judicial officer "*shall* order the return of the child forthwith."  *Id.* (emphasis added).

ORDER – 5

were relevant. At the conclusion of the hearing, the Court directed the parties to prepare and file proposed findings of fact and conclusions of law by February 4, 2022, which they did. Thereafter, the Court began reviewing the entirety of the evidence presented at the hearing, the relevant documents included in the record, and the parties' final submissions and began drafting its final order.

Following the hearing, and unbeknownst to Ms. Silva and Respondent's counsel, the parties entered into a settlement agreement in their Mexican divorce proceeding on February 3, 2022, the day before the parties' final submissions were due to this Court. On that same day, the parties presented their agreement to the Mexican court for entry on the record. As would soon come to light, the parties' agreement included a provision allowing Respondent to maintain custody of the children in the United States.

While the Court continued to consider the matter and draft a final order, Ms. Silva contacted the Court several times to inquire on the status of a final order. First, on February 9, 2022, only the third working day after the parties' final submissions, Ms. Silva contacted the Courtroom Deputy regarding when she could expect a ruling.[8] Ms. Silva again called the Courtroom Deputy on February 14 and left a message emphasizing that three weeks had passed since the Court's hearing without a ruling—a period she characterized as "really beyond the pale"—and intimating that she may take action in another court to try and force the Court to issue a final order. Two days later, on February 16, Ms. Silva again left the Courtroom Deputy a message, again seeking a final ruling from the Court.

The next morning, the morning of February 17, 2022, the Courtroom Deputy emailed counsel for the parties, to keep everyone apprised of Ms. Silva's inquiries, indicating that she had

---

[8] The Court's local rules provide that "motions will be decided as soon as practicable, and normally within thirty days following the noting date." W.D. WASH. LOCAL RULES LCR 7(b)(5).

ORDER – 6

shared Ms. Silva's inquiries with the Court but did not have a set timeframe for a ruling. Within hours, Respondent's counsel notified the Courtroom Deputy that Respondent would be filing a formal notice to update the Court on recent events relevant to the Petition.

Hours thereafter, Respondent's counsel filed a notice informing the Court of the existence of the parties' Mexican settlement agreement. Dkt. #81. Respondent's counsel also indicated their belief that the agreement "fully resolve[d] this matter" as the parties had agreed the children could remain in the United States with Respondent. *Id.* at 1. An accompanying declaration attached a Spanish language copy of the settlement agreement and indicated that a translated copy would be filed as soon as possible.[9] Dkt. #82 at ¶ 1; Dkt. #82 at 5–9. The declaration further explained that a copy of the settlement, and an inquiry as to whether Ms. Silva intended to dismiss the Petition, were sent to Ms. Silva on February 11, 2022, with a follow up email sent on February 14, 2022. *Id.* at ¶¶ 2–3. Even in Spanish, the agreement appeared dispositive. As a result, the Court set a hearing to get updates from counsel on the status of the matter, to consider whether the Court's preliminary injunction should be dissolved[10] and the action dismissed, and to consider the propriety of Ms. Silva's actions. Dkt. #83.

At the hearing, the Court concluded that the parties' agreement was dispositive, dissolved the preliminary injunction, and dismissed the action. The Court also noted its concerns with Ms. Silva's conduct generally and, more specifically, with her failure to notify the Court of the parties' settlement and the unnecessary costs incurred by Respondent's pro bono counsel. For further clarity, the Court requested that Ms. Silva submit a letter responding to the concerns raised

---

[9] Respondent did file a translated copy of the parties' agreement. *See* Dkt. #85-1.

[10] After the parties settled their dispute over custody of the children, the provisions of the preliminary injunction, originally intended to secure Respondent's participation and the children's location, were no longer reasonable or necessary restraints on Respondent's liberty.

ORDER – 7

by the Court. Ms. Silva promptly complied with the Court's request and the Court has considered her response thoroughly.

### III.   DISCUSSION

**A. Sanctions**

The Court first considers whether to impose sanctions on Ms. Silva for the unnecessary expenses incurred by Respondent's pro bono counsel in having the parties' agreement translated. The Court concludes that sanctions are warranted, under the Court's local rules and inherent powers, Federal Rule of Civil Procedure 11, and 28 U.S.C. § 1927, both for Ms. Silva's actions in seeking a potentially inconsistent final ruling after receiving notice of the parties' settlement agreement and for her failure to timely notify the Court of the agreement.

**1. This Court's Local Rules and Inherent Powers**

The Court's local rules[11] provide a directly applicable authority on which Ms. Silva is appropriately sanctioned: "An attorney who fails to promptly notify the court [that a case has settled] may be subject to such discipline as the court deems appropriate, including the imposition of costs or of a fine." W.D. WASH. LOCAL RULES LCR 11(b).[12]

---

[11] Federal Rule of Civil Procedure 83 provides that district courts "may adopt and amend rules governing its practice" that are consistent with federal law and the Federal Rules of Civil Procedure. FED. R. CIV. P. 83(a)(1). Additionally, the Court has inherent power "to fashion an appropriate sanction for conduct which abuses the judicial process." *Chambers v. NASCO, Inc.*, 501 U.S. 32, 44–45 (1991). Sanctions under the Court's inherent power are justified for "willful disobedience of a court order" or for actions taken "in bad faith, vexatiously, wantonly, or for oppressive reasons." *Roadway Exp., Inc. v. Piper*, 447 U.S. 752 (1980). "It is well settled . . . that [a] district court may, in its informed discretion, rely on inherent power rather than the federal rules or [28 U.S.C.] § 1927." *Fink v. Gomez*, 239 F.3d 898, 994 (9th Cir. 2001).

[12] Similarly, the Court's local rules provide that an attorney "who otherwise [acts to] so multipl[y] or obstruct[] the proceedings in a case may, in addition to or in lieu of the sanctions and penalties provided elsewhere in these rules, be required by the court to [personally satisfy] such excess costs and may be subject to such other sanctions as the court may deem appropriate." W.D. WASH. LOCAL RULES LCR 11(c).

ORDER – 8

Here, Ms. Silva failed to notify the Court of the parties' settlement agreement, causing Respondent to incur the cost of translating the Mexican settlement to comply with this Court's rules. The settlement agreement made the Petition moot, warranting dismissal. As the legal effect of the agreement was clear, Ms. Silva could have prepared a stipulated motion for dismissal of the matter without any party needing to submit the Spanish language agreement to the Court.

The Court anticipates Ms. Silva's whataboutery objection: "But Respondent's counsel failed to notify the Court of the parties' agreement when they received it and should be held to equal account!" The Court does not agree as Respondent's counsel did provide timely notice to the Court. The Courtroom Deputy's February 17, 2022, email is the first instance where Respondent's counsel could reasonably infer that Ms. Silva did not intend to notify the Court of the settlement agreement as Respondent's counsel learned, for the first time, that Ms. Silva had continued to seek a final order despite the existence of the parties' settlement agreement. At that time, Respondent's counsel promptly notified the Court of the agreement.

Even if Respondent's counsel had not notified the Court of the agreement, the Court does not find them equally culpable. Ms. Silva was retained by Petitioner to pursue this action and initiated it by filing the Petition. Respondent's counsel appeared pro bono to defend Respondent against Petitioner's arguments that the children should be returned to Mexico. The Court sees no impropriety in holding Ms. Silva responsible for notifying the Court of the parties' agreement wherein her client took a position antithetical to the position taken in the Petition. This is the position clearly taken by Respondent's counsel when, on February 11, 2022, they emailed Ms. Silva a copy of the agreement and inquired whether Ms. Silva "intend[ed] to notify the Court of [the] development." *See generally*, Dkt. #82 at ¶ 2. Ms. Silva, having taken the laboring oar to bring the action, should have taken the laboring oar to resolve the action in accordance with the parties' agreement.

ORDER – 9

Still further, the Court is left to conclude that Ms. Silva acted in bad faith.  Ms. Silva took conscious efforts to seek a final order that she knew could potentially conflict with the parties' agreement.  She does not attribute the actions to mistake.  She also does not assert that she somehow lacked notice of the parties' agreement at the time of her actions.[13]  And Ms. Silva, despite the Court's request, has not justified her actions beyond a vague attribution to her client's inquiry on the status of any final order.[14]  Beyond merely speculating, no other motivation or justification is apparent to the Court.  Accordingly, the Court is left to conclude that Ms. Silva acted in bad faith or took actions tantamount to bad faith and that her actions warrant the imposition of sanctions.

**2. Federal Rule of Civil Procedure 11**

Federal Rule of Civil Procedure 11 provides an alternative basis for sanctioning Ms. Silva's conduct.  That rule provides that an attorney,

> [b]y presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—. . .[,] certifies to the best of the person's knowledge information, and belief, formed after an inquiry reasonable under the circumstances:
>
> (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;
>
> (2) the . . . legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]

---

[13] Ms. Silva cannot be heard to complain that the agreement she received was in Spanish.  Previously, Ms. Silva has represented to the Court that she is at least conversational in Spanish and that her communications with Petitioner were in Spanish.

[14] At best, Ms. Silva indicates that she spoke with Petitioner on February 8, 2022, and that he requested that Respondent's travel documents be released to her.  At that time, Ms. Silva advised Petitioner she could not file the necessary motion but that she expected a ruling soon and would follow up with the Court.  While this may justify Ms. Silva's February 9, 2022 inquiry, it does nothing to explain why she continued to seek a potentially inconsistent final order after she received a copy of the parties' agreement on February 11, 2022.

ORDER – 10

        (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; . . . .

FED. R. CIV. P. 11(b).

        Ms. Silva signed and filed the Petition, post-hearing briefing, and a proposed order including findings of fact and conclusions of law, all of which maintained that the Court was required to order the children back to Mexico. These documents may not have directly violated Rule 11 at the time they were filed. However, when Ms. Silva contacted the Court to prompt a final ruling which she presumably believed would be in her client's favor, she again advocated for the factual and legal contentions in her previously filed documents and their ultimate conclusions that the children should be returned to Mexico.

        But Ms. Silva's advocacy in this manner took place after she had received a copy of the parties' agreement, an agreement that fundamentally altered the factual record. Despite Ms. Silva's frequent contact with Court staff, she made no effort to inform the Court of the new and significant discrepancies.

        Even if Ms. Silva was not able to comprehend the legal significance of the parties' settlement agreement,[15] she failed to make the "inquiry reasonable under the circumstances" that is required by Rule 11. In fact, Ms. Silva does not indicate that she made any inquiry related to the settlement, not even contacting her own client to inquire about the agreement that he had entered. Ms. Silva's actions and omissions violated Rule 11 and "needlessly increase[d] the cost of litigation," warranting sanctions.

---

[15] Portions of Ms. Silva's letter argue that she was "not in a position" to determine the legal significance of the Mexican settlement agreement and that Petitioner did not himself know what issues to raise with her. But this does not excuse what are essential portions of Ms. Silva's representation. Ms. Silva, as Petitioner's counsel and an officer of the Court, was obligated to investigate the significance of the Mexican settlement agreement and to adequately inquire as to the underlying facts.

ORDER – 11

### 3. 28 U.S.C. § 1927

Finally, the Court notes that its decision to sanction Ms. Silva's conduct in this case also finds statutory support. Specifically, Congress has provided that "[a]ny attorney . . . who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927. Imposition of sanctions under § 1927 requires a finding of bad faith. *See Soules v. Kauaians for Nukolii Campaign Comm.*, 849 F.2d 1176, 1185 (9th Cir. 1988). For the reasons explained above, the Court finds that the imposition of sanctions on Ms. Silva would also be appropriate under § 1927.

### 4. Appropriate Sanction

Here, the Court determines that the appropriate measure of sanctions is the amount unnecessarily expended by Respondent's pro bono counsel in obtaining a translated copy of the Mexican settlement agreement. But for Ms. Silva's conduct, Respondent would not have needed to file a copy of the Mexican settlement agreement with the Court and would not have incurred the added expense of having the document translated. At the Court's request, Respondent's counsel indicates that they expended $498.60 to obtain a translated copy of the Mexican settlement agreement. Dkts. #89 and #90. Accordingly, the Court sanctions Ms. Silva in the amount of $498.60.[16] Ms. Silva shall make payment to Respondent's counsel, at their direction, within fourteen days of this Order.

//

//

---

[16] For the purposes of Rule 11, the Court finds that this small monetary sanction is warranted "to deter repetition of the conduct or comparable conduct by others similarly situated." *See* FED. R. CIV. P. 11(c)(4).

ORDER – 12

### B. Notification of the U.S. Department of State

The Court also determines that it will share a copy of this Order with the Department of State. While the Court does not know precisely how Petitioner was placed in contact with Ms. Silva, it believes that the Department of State played a role in facilitating the representation. Central to the Court's decision to provide the Department of State notice of this Order is the Court's difficulty in determining whether Ms. Silva's representation furthered or hindered Petitioner's interests.

The Court does not intend for this Order to be a general indictment of Ms. Silva's professional practice. But the Court's brief exposure to Ms. Silva's overly aggressive and adversarial approach in this case caused it to question whether her skills are well-suited for cases such as this. From the Court's perspective, Ms. Silva appeared to charge forward with righteous indignation, wholly oblivious to the Court's expressed concerns over Respondent's right to due process and the best interests of the children. The Court understood Petitioner's distress at the abrupt termination of his custodial rights. But the Court also understood Petitioner to maintain a concurrent interest in the well-being of his children. These sometimes-competing interests seemed to the Court to warrant a more nuanced approach, addressing both the relevant legal issues and the well-being and best interests of the children.

The Court does not presume to know the relevance that the Department of State may place on the Court's observations of Ms. Silva's conduct. Nevertheless, the Court believes and concludes that the Department of State deserves notice of the Court's concerns with Ms. Silva's steadfast adherence to a narrow and absolutist approach in this case, an approach that may not have coincided with or served Petitioner's interests.

//

//

ORDER – 13

### C. Referral to the Washington State Bar Association for Consideration of Discipline

Finally, the Court determines that Ms. Silva should be referred to the WSBA for possible disciplinary action. At numerous points in this case, the Court was concerned that Ms. Silva's conduct may have been contrary to her professional responsibilities. Attempting to allay its concerns, the Court requested that Ms. Silva provide an explanation of her actions. But Ms. Silva's response lacked substantive explanations, leaving the Court with no satisfactory answers. Therefore, the Court believes that further review is warranted and refers this matter to the WSBA's Disciplinary Board.[17]

The Court's concerns were various, touching on Ms. Silva's initial efforts to withdraw,[18] Ms. Silva's competency regarding the general rules of practice before this Court,[19] the adequacy

---

[17] The Washington State Bar Association's Disciplinary Board serves as the "investigative arm" of the Washington Supreme Court in disciplinary matters, *Eugster v. Wash. State Bar Ass'n*, 2015 WL 5175722, *9 (W.D. Wash. Sept. 3, 2015) (citing *O'Connor v. Nevada*, 686 F.2d 749, 750 (9th Cir. 1982)), "hear[s] the full range of disciplinary matters[,] and has a unique experience and perspective in the administration of sanctions," *In re Disciplinary Proceeding Against Anschell*, 141 Wash.2d 593, 9 P.3d 193, 199 (Wash. 2000) (internal quotations omitted).

[18] Shortly after Petitioner was unsuccessful in his first attempts to serve Respondent, Ms. Silva filed a notice purporting to withdraw from the case. Dkt. #4. Ms. Silva did not seek or obtain leave from the Court, as required by the local rules. *See* W.D. WASH. LOCAL RULES LCR 83.2(b)(1) (providing that, outside of limited circumstances, an attorney "shall [not] withdraw an appearance in any case, civil or criminal, except by leave of court"). The Court struck the notice, both because Ms. Silva failed to comply with the Court's local rules and because the Court was concerned that Ms. Silva was effectively abandoning Petitioner—a native Spanish speaker living in Mexico—to proceed pro se and remotely litigate a Petition which Ms. Silva had just filed. Dkt. #5.

[19] In several situations, Ms. Silva failed to act in accordance with the Federal Rules of Civil Procedure and this Court's local rules. While many of the violations were not themselves significant, they demonstrated Ms. Silva's general lack of familiarity with litigation before this Court, her lack of specific knowledge related to applicable rules and procedures, and her significant ambivalence as to her responsibility to adequately familiarize herself in both areas. *See, e.g.*, Dkt. #4 (purported withdrawal without leave); Dkt. #7 (failure to provide notice of ex parte motion for temporary restraining order); Dkt. #36 (incorrectly seeking both default and default judgment and incorrectly seeking default after Respondent had appeared, without providing necessary notice, and misrepresenting required notice); Dkt. #47 at 2–3 (Court noting

ORDER – 14

of Ms. Silva's inquiry into the factual and legal issues of this case and Ms. Silva's candor with the Court,[20] and the adequacy of Ms. Silva's representation of her client's interests.[21] Additionally, Ms. Silva regularly disregarded the Court's expressed interests and concerns, proceeding on issues that the Court had identified as insignificant to its resolution of substantive issues. At the same time, Ms. Silva further prejudiced the Court's administration of justice by

---

procedural errors and absence of notice warranting denial of motion for default); Dkt. #71 at 1–2 (Court noting failure to timely file motions in limine, lack of good cause to excuse untimely filing, and failure to meet and confer under the local rules).

[20] Several times, the Court was struck by the lack of direct factual or legal support for positions taken by Ms. Silva. *See, e.g.*, Dkt. #38 at 4 (arguing, with inapposite precedent, that Court should appoint interpreters at public expense in this civil proceeding); Dkt. #7 (lack of record evidence, other than Respondent's unlawful departure from Mexico, supporting argument that Respondent was likely to again abscond with the children after settling in Washington). Additionally, Ms. Silva's materials and presentations were sometimes disorganized, hastily prepared, and poorly reasoned. *See, e.g.*, Dkt. #60 at 6–7 (Court noting the inconsistency of Petitioner's complaints that Respondent was not complying with the terms of the Court's preliminary injunction after Petitioner agreed, without notifying the Court or seeking to modify the preliminary injunction, that Respondent need not comply with the Court's preliminary injunction as written); Dkt. #71 at 2–3 (Court noting Petitioner's confusion over "well settled" defense, "mature child" defense, and evidentiary limitations on testimony by a child witness). Still further, Ms. Silva occasionally failed to address matters clearly implicated by the record and instead sought hasty procedural victories on unopposed motions even after the Court raised substantive concerns. Ms. Silva's overstepping of the factual record and legal authorities significantly limited her credibility before the Court.

[21] Ms. Silva's extreme factual, legal, and remedial positions struck the Court as inconsistent, at times, with Petitioner's stated desire to protect the well-being of his children. For instance, Petitioner originally indicated that he did not want the children forcibly removed from Respondent's custody and expressed concern that such an event "might be traumatic for [the children]." Dkt. #13 at ¶ 65. Yet, Ms. Silva later, on several occasions, suggested that the Court should order the forcible removal of the children, with no evidence that the children were in any risk and no other justification for the changed position. Dkt. #28 at 1. Ms. Silva's aggressive positions also seemed to conflict with Petitioner's agreement to settle the matter shortly after the evidentiary hearing. Ms. Silva attributes Petitioner's apparent change of heart to his need to have Respondent remove a lien from the family's former residence so that Petitioner could sell it, a financial motivation that had not been disclosed to the Court previously. And finally, Ms. Silva's failure to educate herself of the circumstances surrounding her receipt of an apparently dispositive settlement agreement, or even contact her client, leaves the Court concerned about the ongoing communication between Petitioner and Ms. Silva.

ORDER – 15

making unnecessary challenges to the Court's authority and rulings, often arguing unfavorable rulings to the argument's dying breath.

Even at the Court's January 21, 2022, remote hearing Ms. Silva needlessly prolonged discussion of procedural questions,[22] presented evidence of limited value or relevance, and failed to address, in any appreciable depth, issues that the Court had indicated were important to its resolution of the case. Surprising even the Court, Ms. Silva persisted in her attempt to present evidence that the Court had ruled inadmissible, ultimately forcing the Court to mute her microphone so that the hearing could proceed in the limited time available to the Court.

Mindful that the Court's vantage point is sometimes limited, the Court sought Ms. Silva's assistance to better understand her conduct. But Ms. Silva's response did little to explain or justify her actions. Instead, Ms. Silva cast much of her conduct as necessary reactions to the actions of others. Ms. Silva did not express any concern with her own conduct and did not exhibit any understanding of her professional responsibilities or the possibility that she could have proceeded differently. Rather, Ms. Silva assigned blame to everyone but herself and displayed many of the same characteristics that originally concerned the Court. Instead of helping the Court to better understand her conduct, Ms. Silva left the Court to draw inferences from its limited observations and to fill the remaining gaps with speculation.[23] As a result, the Court concludes

---

[22] As but one example, Ms. Silva refused to stipulate to facts, in advance of the final hearing, establishing the essential elements of Petitioner's claim and placing the burden on Respondent to prove the applicability of a favorable exception. Because the Court did not understand Ms. Silva's objections to these favorable stipulations, the Court was forced to review the stipulations with Ms. Silva at some length. Ms. Silva eventually agreed to the stipulations, but only after wasting precious time. Even then, Ms. Silva wasted additional time presenting evidence in support of the already established stipulations, at the expense of presenting evidence relevant to the actual disputes.

[23] The Court's speculation unfortunately centers on the possibility that Ms. Silva's actions were driven by financial interests. Shortly after filing the Petition, Ms. Silva sought to withdraw, causing the Court to consider whether Ms. Silva may have initially agreed to limited

ORDER – 16

that this matter is appropriately referred to WSBA for further investigation, if appropriate, and such further action as may be necessary.

## IV.   CONCLUSION

Having considered Ms. Silva's letter and the remainder of the record, and for the reasons laid out previously, the Court finds and ORDERS:

1. The Court imposes sanctions upon Ms. Silva, individually, in the amount of $498.60. Ms. Silva is to pay this amount to Respondent's counsel for the benefit of Respondent or Respondent's counsel, as may be appropriate. Payment shall be made in the manner reasonably requested by Respondent's counsel, within fourteen days of this Order.

//

---

representation of Petitioner. When the Court did not permit Ms. Silva to withdraw at that time, it perceived an increased focus on the availability of costs and attorneys' fees in cases under the Convention. *See* 22 U.S.C. § 9007(b)(3) ("Any court ordering the return of a child . . . shall order the respondent to pay necessary expenses incurred by or on behalf of the petitioner, including court costs, [and] legal fees . . . unless the respondent establishes that such order would be clearly inappropriate."); Dkt. #7 at 17–19 (Petitioner arguing that "[e]ven if Respondent should decide to cooperate and return the children prior to a full hearing, findings should be made regarding her wrongful removal and Petitioner should be awarded a judgment for all costs and fees incurred"). Even as the prospect of Respondent's possible flight from the jurisdiction decreased, Ms. Silva aggressively pushed the Court to enforce its requirement that Respondent post a bond in this matter, a bond which could be available to satisfy any subsequent award of costs and fees. As the case progressed further and became more complicated, Ms. Silva pushed strenuously for quick procedural victories and fought back against indications that the Court had broader concerns with Petitioner's claim. At the same time, Ms. Silva began intimating that the case was a financial burden on both her and Petitioner while Respondent was afforded pro bono counsel.

An award of fees, of course, would be premised upon Petitioner prevailing and the Court ordering the children back to Mexico. Ms. Silva's interest in a final order that appears to lack any other practical importance is more understandable in this light. Hurdles would remain, such as convincing the Court to award fees despite the parties' settlement agreement, but an order in Petitioner's favor would at least bring Ms. Silva a step closer to an award of costs and fees.

The Court hopes that this is not the case. But Ms. Silva has not provided the Court with any other tenable explanation for her otherwise incomprehensible actions. In the complete absence of any other explanation, the possibility of financial interests provides the most readily apparent explanation for Ms. Silva's conduct.

ORDER – 17

2. The Clerk of Court is requested to mail a copy of this Order to:

   U.S. Department of State
   Bureau of Consular Affairs, CA/OCS/CI
   c/o Mrs. Raquel Duran
   SA-17, 9th Floor
   Washington, D.C. 20522-1710

3. The Court will promptly transmit a copy of this Order, with a completed copy of the WSBA's Grievance Against a Lawyer form, to the WSBA's Office of Disciplinary Counsel, with a copy to Ms. Silva.

4. This matter is CLOSED.

DATED this 12th day of April, 2022.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 18